Nos. 38,187, 38,188 and 38,194

RUTH MILBERY, *Appellant* and *Cross-Appellee,* v. THE B. F. MC-
LEAN INVESTMENT COMPANY, MARY B. DOZE, (now McLEAN),
JOHANN McLEAN SANDERS, ANGELEIN TROOK McLEAN, JOHANN
McLEAN SANDERS, As Guardian of the Estate of ANGELEIN TROOK
McLEAN, ELLIS JOHN McLEAN, BENJAMIN D. McLEAN, ELIZABETH
A. McLEAN (*Defendants*) and JULIA C. McLEAN, HELEN McLEAN
ANDERSON, and ANNA McLEAN, as Guardian of HELEN McLEAN
ANDERSON (*Intervenors*), *Appellees* and *Cross-Appellants.*

(243 P. 2d 189)

Opinion filed April 12, 1952.

*Homer V. Gooing,* of Wichita, argued the cause, and *Howard T. Fleeson,
Wayne Coulson, Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk* and *George
W. Holland,* all of Wichita, were with him on the briefs for *Ruth Milbery,
Appellant* and *Cross-Appellee* (*Plaintiff*), Mary B. Doze (now McLean),
johann Sanders, Ellis John McLean, Angelein Trook McLean and Johann
McLean Sanders, as Guardian of the Estate of Angelein Trook McLean (*De-
fendants*) *Appellants* and *Cross-Appellees.*

*Garner E. Shriver,* of Wichita, argued the cause, and *Dale M. Bryant,
Morris H. Cundiff* and *John C. Frank,* all of Wichita, were with him on the
briefs for Elizabeth A. McLean (Anna), *Appellee* and *Cross-Appellant.*

*Verne M. Laing,* of Wichita, argued the cause, and *Lester L. Morris* and
*Fred E. Evans, Jr.,* both of Wichita, were with him on the briefs for The
B. F. McLean Investment Company, *Appellee* and *Cross-Appellant.*

*H. F. Hudson,* of Wichita, argued the cause, and was on the briefs for
Anna McLean, as guardian of Helen McLean Anderson, *Appellee* and *Cross-
Appellant.*

*W. D. Jochems,* of Wichita, argued the cause, and *J. Wirth Sargent, Emmet
A. Blaes, Roetzel Jochems, Robert G. Braden, S C. Durbin* and *J. Francis*

*Hesse,* all of Wichita, were with him on the briefs for Julia C. McLean, *Appellee* and *Cross-Appellant.*

The opinion of the court was delivered by

PARKER, J.: This action was commenced on September 10, 1946, by a minority stockholder of the B. F. McLean Investment Company, a family corporation, asking for the appointment of a receiver for the corporation, which was organized to take over, handle, settle, and distribute the assets of an estate left by an ancestor of all but one of its stockholders. Subsequently, after two stockholders had intervened and remaining stockholders had been made parties by order of the court, the issues were enlarged to include accounting, partition, assertion of additional claims by and against the corporation, enforcement of corporate liens on stock, and other equitable relief. After joinder of issues a trial was had before the Honorable I. N. Williams, judge of the fourth division of the district court of Sedgwick County, Kansas, who died prior to rendering judgment and before completing requested findings and conclusions. Thereafter, by stipulation of the parties, the cause was submitted upon the record to the Honorable George Austin Brown, successor to Judge Williams, who made findings of fact and conclusions of law and rendered a judgment from which each and every party involved in the action has appealed.

Summarized, without attempting to cover every fact of consequence disclosed by a long and tedious record, the events, conditions, and circumstances giving rise to and necessary for a proper understanding of the existing controversy between the parties, can be stated thus:

B. F. McLean, a respected and substantial citizen of Wichita, died testate a resident of Sedgwick county on October 13, 1930, his last will and testament, to which was attached the consent of his widow, being admitted to probate four days later. For present purposes it may be said that under the terms of that instrument he left his estate, which consisted of both real and personal property and was inventoried at some $400,000 subject to debts approximating at least one-half that amount, one-sixth to his son B. Drew McLean, one-sixth to his son John McLean, one-sixth to his daughter Helen McLean, and one-half to his wife, Julia C. McLean, for her life, with a remainder over to his three children, share and share alike; directing that such devisees be appointed as executors of the

will to serve without bond and with full power and authority to act as they deemed best in order to carry out its terms.

No useful purpose would be served by attempting to relate the activities of the executors while acting under the will of B. F. McLean or to detail the proceedings had in probate court while his estate was in process of administration and in any event it would be impossible to do so because the parties have paid little attention to those matters in the record they seek to have reviewed on appeal. It suffices to say the greater portion of the estate's indebtedness was in the form of short term notes which had to be paid promptly unless arrangements could be made with the banks to which they were payable to renew them. The estate had no ready cash and to pay such obligations meant that its assets, consisting in the main of bank stock and real estate, would have to be sold at then existing depression prices and at such a sacrifice practically all of them would be exhausted and nothing would be left for distribution to the decedent's heirs. Mindful of this situation the executors, particularly B. Drew McLean, who was a successful business man and relied on by the other executors to look after the business affairs of the estate, contacted creditors and received assurances that if the heirs would wind up the proceedings pending in probate court and form a family corporation for the purpose of protecting and conserving the assets of the estate they would renew the notes and give them an opportunity to subsequently dispose of such assets under more favorable conditions and at prices which would enable them to ultimately receive substantial financial benefits from the estate of their deceased husband and father. Having received these assurances the executors immediately set about to put into force and effect a plan which would enable them to close the estate in probate court and take over its assets and liabilities as a family corporation. Before this could be done it was necessary to liquidate a relatively small portion of the indebtedness. This, the record indicates, was accomplished by using income received from properties and the proceeds of policies of insurance procured by the deceased testator in his lifetime, five of which were payable to the estate and two payable directly to Julia C. McLean as beneficiary.

Before such plan could be put into operation the executors encountered new and perplexing difficulties. John McLean died in May, 1932, after a long and expensive illness, leaving a will whereby he devised all he possessed, including, of course, his interest in his

father's estate, one-half to his widow, Mary B. McLean, and the other one-half in equal shares to his four minor children, Angelein Trook McLean, Johann McLean, now Sanders, Ellis John McLean, and Ruth Keller McLean, now Milbery. John's death involved the estate still further because he owed considerable money and his creditors had to be paid. Notwithstanding the executors pursued their plans. In order to keep the assets of the B. F. McLean estate intact Julia, Helen, and Drew obligated the B. F. McLean estate, and Drew advanced money personally, in order to pay off the debts left by John McLean with the understanding, agreed to in writing by his widow, that such advancements were to come out of what would come to the John McLean heirs when the B. F. McLean estate was settled. Having thus paid off John's debts the three living executors with Mary McLean joining, as the only adult heir of John McLean, entered into an agreement on the 5th day of October, 1932. This contract, among other things, provided that all parties thereto desired to form a corporation by which all the properties of the B. F. McLean estate could be handled by and in one entity; that such a corporation with a capital of $200,000 would be formed to conserve the property devised under the terms of the B. F. McLean will until the indebtedness of his estate could be liquidated; that the parties signing the agreement would convey, assign, and transfer all their interests in and to such property to the corporation and that in lieu thereof Julia was to receive 1,000 shares of stock in the corporation, Helen 333⅓ shares, Drew 333⅓ shares, and Mary 166⅔ shares, all such shares to have a par value of $100; that stock to be issued as therein indicated should be deposited in a voting trust and should not be subject to transfer or sale until all the indebtedness of such estate was paid; that the interest of the minor children of John McLean in the B. F. McLean estate would be acquired in some manner and subsequently evidenced by the issuance of an additional 166⅔ shares of stock; that when organized and as a part of the transfer of the contracting parties' interest in the property, the corporation was to assume and agree to pay all of the outstanding indebtedness of the estate of B. F. McLean, deceased, including such indebtedness as the persons joining in the contract had theretofore either assumed or become obligated to pay; and that Drew McLean was to act as attorney in fact for all the parties with full power to do any and all things necessary and essential to effect organization of the corporation and enable it to commence business.

Following execution of the contract the corporation was organized in the name of The B. F. McLean Investment Company and its charter was filed with the Secretary of State on October 19, 1932, the original stockholders named therein being the four parties heretofore names as signatories to the contract and Charles G. Yankey, attorney for and long time friend and associate of members of the McLean family, both living and deceased. The first meeting of the incorporators was held on October 21, 1932. The minutes of this meeting show that the charter was accepted, bylaws were adopted, the five incorporators were elected directors, the purposes for which the corporation was organized were stated and outlined, the contract of October 5, 1932, was adhered to and approved, and it was agreed the corporation should acquire the interest of the minor children of John McLean. In addition it was explained that Julia's shares of stock were to be deposited in a voting trust in such manner they should not be subject to transfer or sale without the consent of the living B. F. McLean children; that she was to receive the income from her stock during her lifetime and that at her death such stock was to be divided in like manner as provided under the terms of the will of B. F. McLean, deceased, as to the reversionary interest of the share of his estate bequeathed to her. The minutes further show that at this same meeting Julia, Drew, Helen, and Mary proposed to the corporation that they would cause proper transfers of all of their interests in and to the property and assets of the B. F. McLean estate to be made to the corporation on condition it would take over and assume the indebtedness of the estate and issue each of them the number of shares specified in the original contract. The minutes further disclose this proposal was unanimously accepted by the stockholders and that immediately thereafter the newly elected board of directors met for the first time and passed a resolution giving Drew full, complete, and unlimited authority to transact and carry on the corporation's business.

In order for the corporation to carry on the business contemplated by its incorporators it was, of course, necessary that it acquire possession of and title to all assets remaining in the B. F. McLean estate. This, with the co-operation of the probate court, was accomplished in the following manner: (1) By an order, bearing date of April 13, 1933, closing the estate of B. F. McLean, deceased, and discharging the executors, notwithstanding debts of the estate approximating $190,000 had not been paid; (2) by orders author-

izing Mary B. McLean, who had been appointed guardian of the minor children of John McLean, to sell all the real and personal property interests of such minors in the estate of B. F. McLean to the B. F. McLean Investment Company for $41,000 and accept in lieu of that amount 166⅔ shares of stock in the corporation; and (3) by conveyances of some character, not disclosed by the record, transferring to such corporation all the right, title, and interest owned by Julia, Drew, Helen, and Mary McLean in the assets and properties of the B. F. McLean estate.

The B. F. McLean Investment Company commenced business on the 1st day of June, 1933. On that date, according to an audit prepared for the corporation, dated July 17, 1933, its assets, conceded by everyone to be inflated for purposes of obtaining credit, were valued at $564,057.25 and its liabilities were listed at $189,-596.70. It is interesting to note that the assets shown by this audit consisted of real estate located in the city of Wichita, including an undivided one-half interest in two business buildings and the entire interest in another which were valued at $275,300; 1,406 shares of stock in the Fourth National Bank of Wichita valued at $210,900; a 464-acre farm in Sedgwick county estimated to be worth $72,660, and other personal assets amounting to $5,197.25.

Commencing with the date on which it started business and until September 18, 1944, when he disappeared and left for parts unknown, Drew McLean took over and had the full management and control of the corporation's business. During that period of more than eleven years he disposed of all its city real estate, its bank stock and its other personal assets, using the money realized therefrom (1) to pay the corporation's debts, taxes, operating expenses, and other obligations, including salaries to himself as president and to Mary McLean as secretary of the corporation and (2) to make extensive advancements, but in unequal amounts, to all persons who had acquired shares of stock in the corporation under and by reason of their respective interests in the estate of B. F. McLean.

Shortly after Drew disappeared the remaining directors, who had given the corporation's business very little attention, commenced to take an active interest in its affairs. An investigation disclosed that its tangible assets consisted of a bank account of $5.28 and the 464-acre farm, that it owed taxes, and that a claim for some $10,750, alleged to have been incurred by Drew for and on behalf of the corporation, was outstanding. Thereupon, new directors were elected and for approximately two years attempts were made to

straighten out the affairs of the estate and the corporation to the satisfaction of all persons having an interest therein. That these efforts were unsuccessful is demonstrated by the fact that Ruth Milbery, who had acquired 41⅔ shares in the corporation under the conditions and circumstances previously indicated, commenced this action on the date and for the purposes heretofore stated, obtaining as she did so an order which, while it denied the appointment of a receiver, restrained the corporation from disposing of its remaining assets.

Following the filing of the Milbery petition and after all persons interested in the settlement of the B. F. McLean estate and the liquidation of the corporation, including all living persons heretofore named together with Anna McLean as guardian of Helen McLean Anderson, who was then incompetent, and Johann McLean Sanders as guardian of the estate of Angelein Trook McLean, who was then a minor, had been brought into court and by pleadings joined issues on practically every conceivable controversial question having to do with events connected with the B. F. McLean estate, occurring between the date immediately preceding the execution of his will and the date of the filing of such pleadings, the case was tried by Judge Williams. During the trial much documentary evidence, as well as oral testimony was introduced and received. Without attempting to go into detail it may be said that except for testimony establishing the foregoing factual picture most of the evidence, consisted of audits and financial statements, dealing with operations subsequent to the commencement of business by the corporation and that little, if any, attempt was made to cover operations of like nature from the date of the death of B. F. McLean to the date of the abortive final settlement on April 13, 1933, or during the interim between that date and June 1, 1933, the day on which the corporation took over the assets of the B. F. McLean estate and started to do business.

Sometime after submission of the case to Judge Brown he made extended findings of fact on the record taken by Judge Williams. Many of these findings relate to the status of B. F. McLean's family, the terms of his will, and other matters about which there is no conflict. Some, which are in controversy, relate to withdrawals by stockholders and their interests in the assets. Others, also in dispute, are to the effect the corporation was organized by the heirs of B. F. McLean, deceased, pursuant to a family agreement for the

purpose of taking over all the assets and liabilities of the estate and ultimately making final distribution thereof according to the will of such decedent and with the understanding its remaining assets should be liquidated and so distributed. Conclusions of law were returned along and in conformity with the findings and thereafter judgment was rendered in accordance with both. This judgment, particularly the portion thereof fixing the amounts due and owing to and from the respective parties, which was based upon the accounting made by the trial court on the evidence before it, likewise the portion directing the manner and method of distribution of remaining assets of the estate and the corporation after ascertainment and payment of specific amounts found to be due certain persons, failed to meet with the approval of the litigants with the result that all of them have perfected appeals therefrom.

Our attention is directed to the fact the district court rendered judgment on the record made by Judge Williams and it is urged that under the rule announced in some of our decisions it is the duty of this court to determine for itself what the facts establish and decide the case substantially in the same manner as it would if this were an original action. We decline any such burden for two reasons. To do as suggested would mean we undertake to audit this estate. It was never intended by such rule that this court should or would undertake to make an accounting, such as is here involved. Moreover, the rule does not contemplate that an appellate court, even where the evidence in the court below is entirely documentary in character or in the form of depositions or transcripts, is required to decide a case on the record below where it appears such record is so insufficient and unsatisfactory that to do so would require it to indulge in speculation and conjecture in order to reach a decision.

We have little difficulty in concluding the trial court was correct in its findings respecting the purpose for which the B. F. McLean Investment Company was organized and the manner in which the property acquired from the estate of B. F. McLean should be distributed. An extended examination of the record makes it crystal clear the corporation was created as an auxiliary device to be used in settling such estate and that from the date it commenced business, throughout its operations down to and shortly before the commencement of this action in 1946, all parties interested therein intended, understood, and in fact had agreed such was its function and that ultimately, when all the estate's debts had been paid and

its properties disposed of, the assets remaining would be distributed to persons who might be entitled thereto in accord with the terms of B. F. McLean's will. Indeed, notwithstanding the abortive order closing the estate, in probate court, we are convinced the record compels a conclusion it has never been finally settled or distributed and that now, in view of conditions and circumstances for which the parties themselves are responsible, that can only be accomplished by a full and complete accounting. By this we mean that in order to determine the amount due, if any, to Julia C. McLean on her life estate and the amount due the several beneficiaries herein involved there must be an accurate and complete accounting of the B. F. McLean estate from the date of his death in which there must be taken into consideration, year by year, property and assets owned by him on the date of his death, the income derived therefrom as distinguished from the proceeds of sale thereof, all advancements made by any of the beneficiaries, either to the executors or later to the corporation, to provide moneys to protect the estate, amounts expended and properly chargeable as expenses of administration, amounts expended in paying the debts of B. F. McLean or other debts assumed in connection with the protection and settlement of his estate or the corporation, the dates and amounts of payments made to any of the beneficiaries from time to time, and which are probably chargeable against any of them as advancements or payments on the amount or share to which each may be ultimately found to be entitled, and any and all other information necessary and sufficient to enable the court or its officers to fully and finally determine the estate has been fully collected and converted into money, the debts fully paid, the share to which each beneficiary would have been entitled had no advancements been made either by or to any beneficiary, and the amount now due each such beneficiary in view of the fact such advancements have actually been made.

Having reached the conclusion just announced it necessarily follows that unless the trial court's accounting covers the full period of time heretofore indicated and includes all matters herein mentioned its findings and conclusions with respect to the amounts the respective parties would be entitled to receive under the will of B. F. McLean are erroneous and cannot be upheld. Therefore we next direct attention to that question.

Examination of the record makes it clear, that in the main, not-

withstanding its findings the corporation should be liquidated and the assets remaining therein distributed as provided in the will of B. F. McLean, deceased, the trial court in reaching its decision as to the extent of the interests of the beneficiaries entitled to share in the estate used figures disclosed by three different audits. One of these audits, to which we have heretofore referred, was prepared for the corporation shortly after it commenced business and shows the state of its affairs at that time. Another audit, prepared at the request of the corporate officers and dated December 13, 1944, covers the operations of the corporation from June 1, 1933 to October 18, 1944. Another audit prepared at the request of counsel for one and perhaps two of the parties, shortly before the trial, covers from June 1, 1933, to December 31, 1946. In passing it is to be noted that none of these audits purports to cover the period antedating the date on which the corporation commenced business or, except to indicate its assets came from the B. F. McLean estate, the particular source from which such assets were derived. We have no doubt the trial court's action in reaching this decision was due to the lack of evidence regarding much of what had transpired before the corporation commenced business and to contentions of several of the parties to the effect the audits contained ample information and were sufficiently accurate to enable it to make a proper accounting.

In fact similar contentions are advanced on appeal by some of the parties who argue the last audit of record contains sufficient information to permit an accounting and insist that it is not only correct but that all of the parties have so agreed. The claim all parties concede correctness of this audit is not borne out by the record. Even so, that question need not be labored for such audit shows on its face it is incomplete and inaccurate. Without going into detail as to everything it discloses, we note it lists advancements made by the corporation to the wife and children of B. F. McLean at the sum of $158,495.13 whereas it shows the amount available for that purpose was only $142,288.13. In other words that distribution made by the corporation exceeded the amount available for distribution by $16,207. It should perhaps be added the audit of December 13, 1944, discloses a like situation respecting amounts on hand for distribution and amounts actually distributed. Just where the difference came from is undisclosed and we cannot speculate now that it represented advancements made for which no credit

has been given for the reason it was not reflected in the corporation's accounts on which the audit relied on was based. Neither does this audit, or for that matter any of the others made for the corporation, reflect the dates as to when assets were converted or when income was received in order that it might be determined whether any sums were due to Julia, the widow, on her life estate. Nor do they show when advancements for and on behalf of the estate and corporation were made by some of the beneficiaries or when payments in the nature of advancements were made by the corporation to beneficiaries, each and all of which must necessarily enter into any determination of the amounts which will be due such persons on final settlement.

What has been heretofore stated is enough to demonstrate that the audits on which some of the parties would base the accounting are not only incorrect but so lacking in essential details that it would be impossible for this or any other court to render a judgment determining the rights of the respective parties in and to the assets in question without indulging in speculation, conjecture, and guesswork. Nevertheless it does not necessarily follow the record before the trial court was so inadequate as to preclude an accounting. We therefore turn to that question.

Further examination of the record as abstracted shows that it does not contain any complete information as to the original assets of B. F. McLean at the time of his death or what was done with them. It does disclose that whatever may have been done as to collection or disposition of assets prior thereto, that at the time of the purported settlement on April 13, 1933, the assets of the estate had not been converted into cash, its debts had not been paid, and the estate in its unsettled condition was finally turned over to the corporation. There is evidence tending to show that prior to that time Julia and Drew each advanced moneys to the executors to be used in protecting the estate. The record also shows that while such estate was in process of administration the McLean heirs, as a unit, and Drew personally, had obtained credit and advanced funds to John McLean during his lifetime, to his family after his death, and to his estate while it was in process of administration, all for the purpose of protecting the B. F. McLean estate, with the understanding these advancements were to be repaid when the latter estate was settled. The record is silent on whether any adjustments were made with respect to the matters just mentioned at

the time of the purported settlement. In fact, the record of the so-called final settlement is so incomplete that to determine what was done while the estate was being administered in probate court is left almost entirely to speculation and conjecture.

The counter abstract makes it appear that on the date of the purported settlement in probate court the estate owned 1,353 shares of stock of the Fourth National Bank of Wichita, valued at $163 per share. The audits made for the corporation show that at the time it commenced business it owned 1,406 shares of such stock. Just what happened between April 13, 1933, and June 1, 1933, to increase the assets of the estate to that extent is not shown. The same source also discloses that prior to that time Drew owned thirty shares and John owned twenty-three shares of this same bank stock. If anyone received credit for increasing the assets of the estate to this extent the record does not show it.

Touching matters occurring after the corporation commenced business there is evidence indicating that Drew advanced considerable money to assist in carrying on the business of the corporation during the first few years it was in operation. We can only speculate as to the amount of these advancements or whether he received credit therefor. The same holds true of advancements made by Drew, acknowledged under the contract of June 10, 1932, between the B. F. McLean heirs and Mary B. McLean, wherein it is expressly stated that payments made by him personally for and on behalf of the John McLean family were to be credited to him in the eventual settlement of the B. F. McLean estate out of the share of John McLean therein.

Based on the foregoing facts and circumstances, and others to be found in the record which we have not deemed it necessary to mention specifically, we are convinced the evidence presented to the district court on the trial of this case did not cover the period of time required or disclose the facts necessary to enable or permit it to make a full and complete accounting. We are further convinced that such evidence was not sufficient to enable that court, or for that matter this court on appeal, to reach an intelligent or just decision regarding the rights of the respective parties in and to the distributive shares they will be ultimately entitled to receive from the B. F. McLean estate. Therefore, since the trial court's judgment is founded on evidence of that character, it is ordered that its findings of fact and conclusions of law, filed April 7, 1950,

as modified on April 29, 1950, and the judgment based thereon, be set aside and held for naught. It is further ordered that the cause be remanded to the trial court with instructions to appoint a master who shall be directed to sell and convert into cash all of the unsold real and personal assets belonging to the estate of B. F. McLean or to the B. F. McLean Investment Company, after having given notice of sale under such reasonable terms and conditions as the trial court may determine, the said master to take such testimony as may be necessary to make a full and complete audit and accounting of all matters connected with the estate of B. F. McLean or the B. F. McLean Investment Company consistent with this opinion. It is further ordered that after taking such action the said master report his findings and recommendations for a final and complete settlement of the matters herein involved to the trial court for its information, which shall then hear and determine such matters, find the amount available for distribution to the beneficiaries under the will of B. F. McLean, deceased, and the amount due to each of the several beneficiaries, and after making provision for the payment of all proper allowances to the master for his services and expenses, allowance to such attorneys as may be entitled thereto, and costs of this action, order the balance remaining paid to the several beneficiaries in the amount found to be due.

Inasmuch as the assets now on hand and under control of the corporation will eventually be paid to the several parties here involved according to their respective interests it is ordered that the costs of this appeal be paid by the B. F. McLean Investment Company.

The judgment is reversed and the trial court is ordered to proceed with the cause in accord with the views expressed and the directions set forth in the opinion.